**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re Morgan Stanley Data Security Litigation* | Docket No.<br>1:20-cv-05914 (PAE) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION
EXPENSES, AND SERVICE AWARDS TO THE NAMED PLAINTIFFS**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

LEGAL ARGUMENT.......................................................................................................10

I.     PLAINTIFFS' COUNSEL'S REQUESTED ATTORNEYS' FEE
AWARD IS FAIR AND REASONABLE...............................................................10

     A.     <u>Legal Standard</u> ........................................................................................10

     B.     <u>This Court Should Apply the Percentage of the Fund Method in
This Common Fund Case</u>.........................................................................12

     C.     <u>The Fee Request is Reasonable Under the Percentage of the Fund
Method</u> ...................................................................................................13

     D.     <u>A Lodestar-Multiplier "Cross-Check" Further Confirms the
Reasonableness of Plaintiffs' Requested Fee</u> ...........................................15

     E.     <u>Plaintiffs' Counsel's Fee Request is Also Reasonable Under the
Goldberger Factors</u>..................................................................................18

         1.     Plaintiffs' Counsel Invested Substantial Time and
Resources Over the Course of This Litigation...............................18

         2.     This Class Action Included Complex Legal Issues ......................20

         3.     The Requested Fee is Warranted Based on the High-Risk
Nature of the Litigation.................................................................22

         4.     Plaintiffs' Counsel Provided (and Continue to Provide)
High-Quality Representation .........................................................24

         5.     The Fee Request Is Reasonable in Relationship to the
Settlement ......................................................................................26

         6.     Public Policy Supports Approval of the Fee..................................27

     F.     <u>The Reaction of Class Members Supports Plaintiffs' Counsel's Fee
Request</u>....................................................................................................28

II.    PLAINTIFFS' COUNSEL'S REQUEST FOR REIMBURSEMENT OF
LITIGATION COSTS IS REASONABLE ..........................................................29

III.    PLAINTIFFS' REQUEST FOR MODEST SERVICE AWARDS IS
REASONABLE ..................................................................................................30

CONCLUSION.................................................................................................................32

# TABLE OF AUTHORITIES

## Cases

*Abel v. Town Sports Int'l, LLC*,
  No. 09 Civ. 10388 (DF), 2012 WL 6720919 (S.D.N.Y. Dec. 18, 2012)................................... 10

*Asare v. Change Grp. of N.Y., Inc.*,
  No. 12 Civ. 3371 (CM), 2013 WL 6144764 (S.D.N.Y. Nov. 18, 2013) .................................. 17

*Baffa v. Donaldson Lufkin & Jenrette Secs. Corp.*,
  2002 WL 1315603 (S.D.N.Y. June 17, 2002) ......................................................................... 13

*Beckman v. KeyBank, N.A.*,
  293 F.R.D. 467 (S.D.N.Y. 2013) ............................................................................................ 16

*Blum v. Stenson*,
  465 U.S. 886 (1984) .......................................................................................................... 10, 11

*Capsolas v. Pasta Res. Inc.*,
  2012 WL 4760910 (S.D.N.Y. Oct. 5, 2012) ........................................................................... 17

*Cates v. Trs. of Columbia Univ. in City of N.Y.*,
  2021 WL 4847890 (S.D.N.Y. Oct. 18, 2021) .............................................................. 23, 26, 29

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
  504 F.3d 229 (2d Cir. 2007) .................................................................................................. 10

*Chatelain v. Prudential-Bache Sec.*,
  805 F. Supp. 209 (S.D.N.Y. 1992) ......................................................................................... 24

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974) .................................................................................................. 10

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448, 470 (2d Cir. 1974) .......................................................................................... 23

*City of Providence v. Aeropostale, Inc.*,
  No. 11 Civ. 7132 (CM), 2014 WL 1883494 (S.D.N.Y. May 9, 2014)..................................... 17

*DeLeon v. Wells Fargo Bank, N.A.*,
  No. 12 Civ. 4494 (RLE), 2015 WL 2255394 (S.D.N.Y. May 11, 2015) ................................. 30

*Dial Corp. v. News Corp.*,
  317 F.R.D. 426 (S.D.N.Y. 2016) ...................................................................................... 16, 31

*Dornberger v. Metro. Life Ins. Co.*,
    203 F.R.D. 118 (S.D.N.Y. 2001) ................................................................................ 30

*Dupler v. Costco Wholesale Corp.*,
    705 F. Supp. 2d 231 (E.D.N.Y. 2010) ...................................................................... 30

*Fleisher v. Phoenix Life Ins. Co.*,
    No. 11-cv-8405 (CM), 2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015) .............................. 25, 29

*Fox v. Vice*,
    563 U.S. 826 (2011) ................................................................................................ 16

*Frank v. Eastman Kodak Co.*,
    228 F.R.D. 174 (W.D.N.Y. 2005) ............................................................................ 23

*Fresno Cty. Employees' Ret. Ass'n v. Isaacson/Weaver Family Tr.*,
    925 F.3d 63 (2d Cir. 2019) ...................................................................................... 12

*Goldberger v. Integrated Res.*,
    209 F.3d 43 (2d Cir. 2000) .............................................................................. *passim*

*Guippone v. BH S&B Holdings, LLC*,
    2011 WL 5148650 (S.D.N.Y. Oct. 28, 2011) ............................................................ 30

*Hammond v. The Bank of N.Y. Mellon Corp.*,
    2010 WL 2643307 (S.D.N.Y. June 25, 2010) .......................................................... 23

*Hernandez v. Compass One, LLC*,
    2021 WL 4925561 (S.D.N.Y. Oct. 21, 2021) ............................................................ 15

*In re Am. Bank Note Holographics*,
    127 F. Supp. 2d 418 (S.D.N.Y. 2001) ...................................................................... 22

*In re Beacon Assocs. Litig.*,
    No. 09 CIV. 3907 CM, 2013 WL 2450960 (S.D.N.Y. May 9, 2013) ................................ 12

*In re BHP Billiton Limited Securities Litigation*,
    No. 1:16-cv-01445-NRB, 2019 WL 1577313 (S.D.N.Y. Apr. 10, 2019) ............................ 26

*In re Citigroup Inc. Bond Litig.*,
    988 F. Supp. 2d 371 (S.D.N.Y. 2013) ...................................................................... 21

*In re Citigroup Inc. Sec. Litig.*,
    965 F. Supp. 2d 369 (S.D.N.Y. 2013) ...................................................................... 12

*In re Credit Default Swaps Antitrust Litig.*,
  2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016). ....................................................... 16

*In re Currency Conversion Fee Antitrust Litig.*,
  263 F.R.D. 110 (S.D.N.Y. 2009) ....................................................................... 30

*In re Colgate-Palmolive Co. ERISA Litig.*,
  36 F. Supp. 3d 344 (S.D.N.Y. 2014) ............................................................ 12, 15

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
  279 F.R.D. 151 (S.D.N.Y. 2011) ....................................................................... 28

*In re Global Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) .................................................................. 28, 21

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014) ..................................................... 27

*In re Holocaust Victim Assets Litig.*,
  2007 WL 805768 (E.D.N.Y. Mar. 15, 2007) ...................................................... 21

*In re IMAX Sec. Litig.*,
  No. 06 Civ. 6128 (NRB), 2012 WL 3133476 (S.D.N.Y. Aug. 1, 2012) ................... 10

*In re J.P. Morgan Stable Value Fund ERISA Litig.*,
  2019 WL 4734396 (S.D.N.Y. Sept. 23, 2019) ............................................... 26, 27

*In re Lloyd's Am. Tr. Fund Litig.*,
  2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002).................................................... 14

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  11 MD 2262 (NRB) (S.D.N.Y. Aug. 14, 2018) ................................................... 30

*In Re Marine Midland Motor Vehicle Leasing Litigation*,
  155 F.R.D. 416 .............................................................................................. 14

*In re Marsh ERISA Litig.*,
  265 F.R.D. 128 (S.D.N.Y. 2010)................................................................... 14, 15

*In re Merrill Lynch Tyco Research Sec. Litig.*,
  249 F.R.D. 124 (S.D.N.Y.2008) ............................................................. 10, 12, 23

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998) .......................................................... 20, 21, 24

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    991 F. Supp. 2d 437 (E.D.N.Y. 2014) ................................................................... 23, 24

*In re Rite Aid Corp. Sec. Litig.*,
    396 F.3d 294 (3d Cir. 2006) ....................................................................................... 17

*In re RJR Nabisco, Inc. Sec. Litig.*,
    1992 WL 210138 (S.D.N.Y. Aug. 24, 1992) .............................................................. 17

*In re Sumitomo Copper Litig.*,
    74 F. Supp. 2d 393 (S.D.N.Y. 1999) ......................................................................... 26

*In re Telik, Inc. Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008) ....................................................................... 21

*In re Visa Check/Mastermoney Antitrust Litig.*,
    297 F. Supp. 2d 503 (E.D.N.Y. 2003) ....................................................................... 29

*In re Vitamin C Antitrust Litig.*,
    2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012) ........................................................... 28

*In re Warner Comm'ns. Secs. Litig.*,
    618 F. Supp. 735 (S.D.N.Y. 1985), *aff'd* 798 F.2d 35 (2d Cir. 1986) ...................... 25

*In re Warner Comm'ns. Secs. Litig.*,
    798 F.2d 35 (2d Cir. 1986) ......................................................................................... 14

*In re WorldCom, Inc. Sec. Litig.*,
    338 F.Supp. 2d 319 (S.D.N.Y. 2005) ............................................................. 13, 25, 27

*Jander v. Ret. Plans Comm. of IBM*,
    2021 WL 3115709 (S.D.N.Y. July 22, 2021) ............................................... 10, 11, 17

*Jermyn v. Best Buy Stores, L.P.*,
    2012 WL 2505644 (S.D.N.Y. June 27, 2012) ........................................................... 24

*Maley v. Dale Global Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002) ....................................................................... 17

*McDaniel v. Cnty. of Schenectady*,
    595 F.3d 411 (2d Cir. 2010) ....................................................................................... 11

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970) .................................................................................................... 29

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
    2021 WL 76328 (S.D.N.Y. Jan. 7, 2021) ................................................................. 11

*Pennsylvania Public School Employees' Retirement System v. Bank of America Corp.*,
    318 F.R.D. 19 (S.D.N.Y. 2016) ............................................................................. 15

*Sand v. Greenberg*,
    2011 WL 1338196 (S.D.N.Y. Mar. 22, 2011) ........................................................ 30

*Shapiro v. JPMorgan Chase & Co.*,
    2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ........................................................ 27

*Silberblatt v. Morgan Stanley*,
    524 F.Supp.2d 425 (S.D.N.Y. Nov. 19, 2007) ....................................................... 16

*Story v. SEFCU*,
    2021 WL 736962 (N.D.N.Y. Feb. 25, 2021) .................................................... 20, 22

*Strauss v. Little Fish Corp.*,
    2020 WL 4041511 (S.D.N.Y. July 17, 2020) ........................................................ 15

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
    2004 WL 1087261 (S.D.N.Y. May 14, 2004) ....................................................... 23

*Velez v. Novartis Pharms. Corp.*,
    2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) ................................................. 14, 15

*Wal-Mart Stores Inc. v. U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005) ........................................................................ 11, 12, 26

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96, 121 (2d Cir. 2005) ........................................................................... 30

**Rules**

Fed. R. Civ. P. 23(f) ................................................................................................... 24

Fed. R. Civ. P. 23(h) ............................................................................................ 10, 29

**Other Authorities**

Alba Conte, 1 *Attorney Fee Awards* § 2:19 (3d ed. 2004) .......................................... 28

William B. Rubenstein, 5 *Newberg on Class Actions,* § 17:8 (5th ed. 2018) ............................... 30

Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*,
   158 U. Pa. L. Rev. 2043 (2010).............................................................................. 26

*Manual for Complex Litigation*, Fourth, §14.121 (2004) ........................................... 12

## INTRODUCTION

When Morgan Stanley gave notice of the Data Security Incidents, it offered its former and present accountholders little information about what happened and only 24 months of credit monitoring. As a result of the efforts of Plaintiffs' Counsel, Class members will now receive monetary compensation, at least 24 months of fraud monitoring and protection services, and peace of mind that Morgan Stanley will endeavor to retrieve missing devices and has committed to changing its business practices. Plaintiffs' Counsel[1] have worked tirelessly in prosecuting this matter on behalf of the Settlement Class and have achieved a very significant and favorable result. The Settlement Agreement provides for one of the most substantial relief packages ever achieved on a per-Class member basis in a data security class action. This is despite the fact that in this unique litigation there was no "hacker" alleged to have infiltrated Morgan Stanley's systems, no stolen computer equipment, and certainly no admission by Morgan Stanley that its clients' information had been accessed by a third party.

If the Settlement receives final approval, Morgan Stanley will established a $60 million cash non-reversionary common fund, which will be used to: 1) buy at least two years of comprehensive financial account fraud monitoring and insurance services for the entire Class, without the need to submit a Claim; 2) pay for out-of-pocket expense reimbursement up to $10,000 per Class Member for all actual, incurred costs or expenditures that are fairly traceable to the Data Security Incidents and have not been otherwise reimbursed; and 3) pay for both attested lost time reimbursement (up to $100 per class member) and documented lost time reimbursement. In addition to the $60 million cash fund, the Settlement provides for Morgan Stanley to bear the costs of notice to over 15 million Class members and all costs of settlement administration (estimated to be at least $8.2 million), substantial business practice changes, and the retention of Kroll to

---

[1] Unless otherwise noted, all capitalized terms are defined in the Settlement Agreement and Release, previously filed at ECF No. 81-2 at 15, and referred to hereafter as "SA" or "Settlement."

continue efforts to search for and retrieve the missing Morgan Stanley IT devices, which are the subject of this Action.

Not only does the Settlement offer Class members the opportunity to be reimbursed for out-of-pocket expenses and time spent to date, the Settlement offers the Class further value by mitigating the risk of future identity theft or fraud arising out of the Data Security Incidents. A key component of the Settlement is that Morgan Stanley has committed to hire Kroll, a global leader in forensic investigations, to continue efforts to locate and retrieve decommissioned IT assets that were sold to third parties. Kroll has teams of dedicated cyber risk experts with extensive experience retracing and recovering data. These retrieval efforts will continue for a period of 12 months, and will follow a detailed protocol to be agreed upon with Class Counsel. Kroll will report its progress to Class Counsel and defendant's counsel quarterly and at the conclusion of the 12-month period. Further, Morgan Stanley has committed to maintain several business practice changes that were made in response to the Data Security Incidents. These changes include significant and ongoing investments in its technology decommissioning processes. The business practice changes and device retrieval effort (along with the Financial Shield services) will substantially reduce the risk of any future harm to the Class.

In all, the total settlement value is greater than $68.2 million and provides for current compensation as well as protection against future harm. To achieve this result, Plaintiffs' Counsel diligently and creatively litigated for over a year and a half; conducted extensive research and investigation as to the challenging and complex legal and factual claims; retained data security, dark web, and forensic experts and investigators and worked with them to provide forensic analysis; engaged a damages expert; drafted two voluminous and detailed consolidated amended complaints; defended against a motion to dismiss the entire action; reviewed over 163,300 pages of party and third party documents; analyzed and negotiated several privilege logs; deposed multiple party and third party witnesses; prepared subpoenas for 19 third parties; engaged in three full day-long mediation sessions spread out over a period of several months before the Hon. Diane

M. Welsh (Ret.),[2] with substantial additional negotiations and exchange of legal and factual memoranda following each session; and drafted and submitted the Settlement Agreement and Preliminary Approval Motion and its concomitant notices.

In compensation for their efforts, Plaintiffs' Counsel seek less than 29.3% of the value of the total proposed settlement package, which is at least $68.2 million. The value of the proposed settlement includes the sizeable costs of notice and administration, which as of this time are in excess of $8.2 million, and the retention of Kroll to locate and retrieve additional missing devices

This request is on par with awards routinely granted by the Second Circuit and reflects a 2.75 multiplier based on Plaintiffs' Counsel's lodestar of $7,188,210.81[3], as described below and in the Declarations of Linda P. Nussbaum (attached as <u>Exhibit A</u>, hereinafter "Nussbaum Decl.") and Prof. Brian Fitzpatrick (attached as <u>Exhibit B</u>, hereinafter "Fitzpatrick Decl."), and accompanying exhibits.

Plaintiffs' Counsel also seek reimbursement from the Settlement Fund in the amount of $253,994.53 for litigation costs and expenses that were reasonably and necessarily incurred by counsel in connection with the Action. Finally, Plaintiffs seek modest Service Awards of $5,000 per Settlement Class Representative, for the time and involvement they have put into this Action over the last year and a half.

The fees, costs, and expenses sought here are factually well-supported by the declarations of counsel, lodestar totals, expense breakdowns, and detailed time records.

---

[2]   A declaration by the Hon. Diane M. Welsh (Ret.) is annexed as Exhibit 1 to the Declaration of Linda P. Nussbaum, attached hereto as Exhibit A.

[3] The lodestar and expense numbers presented are based on figures incurred as of March 1, 2022. Plaintiffs' counsel have spent and will continue to spent additional time preparing for the Final Approval Hearing, including speaking with class members and answering their questions regarding the Settlement and claims process.  Plaintiffs' counsel will provide an update on their lodestar prior to the Final Approval Hearing.

## **FACTUAL BACKGROUND**

In June 2020, Morgan Stanley sent millions of notices of Data Security Incidents to its clients concerning events that had occurred years earlier, in 2016 and 2019. The notices were void of details and, Plaintiffs later learned, were sent by Morgan Stanley only because it was required to do so pursuant to an Office of the Comptroller of the Currency (OCC) consent order.

Once Plaintiffs received notice from Morgan Stanley that their personal identifying information (PII) potentially had been impacted by the Data Security Incidents, they retained their respective counsel, and after investigation, counsel, who specialize in data security class actions, filed complaints (Nussbaum Decl. ¶ 11, 14). Because the notice letters and public information on the Data Security Incidents were scant of details, Plaintiffs' Counsel engaged in extensive discovery and expert analysis to uncover what actually occurred, and the true nature of this case. As part of that process, Plaintiffs' Counsel served almost twenty third-party subpoenas and conducted several depositions.[4] Plaintiffs' Counsel discovered that despite not having sent notice of the Data Security Incidents to its clients until 2020, Morgan Stanley in fact had been alerted to the incidents in 2018 by Mr. Oklahoma, an online purchaser of used Morgan Stanley devices. Plaintiffs' Counsel deposed Mr. Oklahoma and reviewed his emails and documents, which were not duplicative of documents produced by Morgan Stanley in this case. Plaintiffs' Counsel learned that Morgan Stanley waited many months before retrieving the decommissioned Morgan Stanley devices from Mr. Oklahoma and negotiated a confidentiality agreement and payment to Mr. Oklahoma as part of the retrieval process.

The factual background developed from deposing Mr. Oklahoma led counsel to contact other downstream purchasers of devices as well as law firms and consultants hired by Morgan

---

[4] See the accompanying Declaration of Linda P. Nussbaum at ¶¶ 19 - 23.

Stanley as part of its triage upon learning on the incidents.  Plaintiffs' Counsel's investigation uncovered facts that made clear that the prior efforts by Morgan Stanley to trace and retrieve its decommissioned devices had been less than diligent.  Plaintiffs' Counsel were able to locate one downstream purchaser who still had possession of devices he had purchased over the internet and coordinated with counsel for Morgan Stanley to retrieve the devices..  This individual referred to the former Morgan Stanley devices that Plaintiffs' Counsel recovered from his closet as a "Pandora's Box."

Plaintiffs' Counsel engaged a cyber forensic expert to conduct analyses on both the Mr. Oklahoma devices and the "Pandora's Box."  On the Pandora's Box device, Plaintiffs' expert was able to locate personal information for one of the named plaintiffs. Morgan Stanley also retained experts to forensically evaluate the devices, and they differed with the results of the examination by Plaintiffs' expert.

Despite the facts developed by Plaintiffs' Counsel in discovery, Morgan Stanley continued to vigorously fight the case and filed a motion to dismiss all claims, stressing a lack of Article III standing and a lack of proof of any access by any unauthorized third party to any Morgan Stanley client PII.  Morgan Stanley mounted challenges to the forensic findings of plaintiffs' expert, holding steadfast to its claim that the majority of its devices had been wiped, that there was no evidence that any downstream purchasers had nefarious intent when purchasing the devices, and that there was a lack of evidence that any of the data had been misused, citing for example the lack of finding Morgan Stanley customer data for sale on the dark web.

Nevertheless, Plaintiffs' Counsel persisted, engaging in what one defense counsel referred to as "diabolical discovery." Through extensive discovery of the facts, expert analysis of the devices, legal analysis of Morgan Stanley's defenses, and three full days of in-person mediation

sessions over a several month long period, Plaintiffs' Counsel were in a well-informed position to accept a mediators' proposal and reach the very favorable settlement before the Court. (Nussbaum Decl. ¶¶ 39, 62).

Judge Torres had encouraged early dispute resolution, and the parties agreed to engage in mediation before the Hon. Diane Welsh (Ret.). As discussed above, prior to any mediation session, the parties engaged in months of extensive discovery and expert analysis. The parties then exchanged detailed mediation briefs addressing the factual and legal disputes, particularly the novel posture of this case where there was no hacker, no intervening criminal act, and no proof that information on the devices had been used by an unauthorized third party.

On May 24, 2021, the parties attended the first full-day mediation session in person with Judge Welsh. (Nussbaum Decl. ¶¶ 39, 62). While the parties made some progress, several key factual and legal issues remained. For the next several months, the parties continued intensive litigation, which included discovery from an additional 15 third parties. The parties also had several rounds of letters and motion practice regarding defendant's motion to dismiss, and an additional amended consolidated complaint of over 120 pages was drafted and served.

On August 18 and August 23, 2021, the parties participated in two full days of mediation, once again in person with Judge Welsh. Although the parties came significantly closer to reaching an agreement, some issues were still outstanding. (Nussbaum Decl. ¶¶ 66 - 69). Over the next twelve weeks, the parties continued litigating while also negotiating with the assistance of Judge Welsh. Ultimately the parties agreed, through a double-blind process, to a mediator's proposal that covered all material terms of the settlement. (Nussbaum Decl. ¶¶ 66 - 69). A term sheet was executed on November 3, 2021, and the parties began diligently drafting and finalizing the Settlement, Notice and Claim Forms, and drafting the motion for preliminary approval for

presentment to Judge Torres. (Nussbaum Decl. ¶ 70).  Judge Torres granted Plaintiffs' motion for preliminary approval on January 18, 2022.

I.     **Terms of the Settlement**

The Settlement provides for significant monetary and equitable relief.  (Nussbaum Decl. ¶¶ 2, 4, 72).  Morgan Stanley has agreed to pay $60 million in a non-reversionary cash Settlement Fund for the benefit of Class Members.   Settlement Agreement ¶¶ 1.34, 2.1, 6.1, 7.1.   The Settlement Fund also will be used to pay any amounts approved by the Court for awards of attorneys' fees, costs, and expenses and service awards and escrow account tax liabilities and tax expenses.  *Id.* at ¶ 2.2.

The $60 million non-reversionary Settlement Fund will provide several types of monetary relief to Class Members. (Nussbaum Decl. ¶ 72). Upon final approval of the Settlement, all Settlement Class Members will be provided access to Aura's Financial Shield services ("Aura Financial Shield") for a period of at least 24 months from the Effective Date of the Settlement, without the need to file a claim. (Nussbaum Decl. ¶ 72). The financial fraud insurance services provided by the Settlement are much more valuable than and not duplicative of the credit monitoring previously offered by Morgan Stanley; they focus on protecting financial assets, freezing identity at 10 different credit bureaus including the three main credit bureaus, home and property title monitoring, dark web monitoring, credit freeze assistance, lost wallet protection, income tax protection and other services.  The services are integrated with Early Warning Services to provide real-time monitoring of financial accounts. Financial Shield also carries a $1,000,000 policy to protect the subscriber.  This service will notify consumers in near real-time if there is any change in a registered financial account (such as a credit card account, checking or savings account, or investment account), new signatory request, new account opening, wire transfer

requests, and other events targeted by hackers and online thieves.  Thus, this service provides expansive identity theft and fraud monitoring for Settlement Class Members.  The Aura Financial Shield services retail for approximately $135 per year per enrollee.

The Settlement Fund will also be used to make payments to people who submit valid claims for "Out-of-Pocket Expenses" and/or up to four hours of "Lost-Time" incurred as a result of the Data Security Incidents. (Nussbaum Decl. ¶ 72).  Settlement Class Members may submit a claim for both types of relief if applicable to them.  Those who spent time researching or remedying issues related to the Data Security Incidents may file a claim to receive reimbursement for up to four (4) hours of attested to time at $25 per hour. No additional separate documentation will be required. The lost time benefit simply requires a Class member's attestation that they spent up to four (4) hours related to the Data Security Incidents. (Nussbaum Decl. ¶ 72).

Out-of-Pocket Expenses, meaning actual, incurred costs or expenditures that are fairly traceable to the Data Security Incidents, will be capped at $10,000 per individual and include, without limitation, unreimbursed losses relating to identity fraud or identity theft; professional fees including attorneys' fees, accountants' fees, and fees for credit repair services; costs associated with freezing or unfreezing credit with any credit reporting agency; credit monitoring costs that were incurred on or after July 1, 2020, through the date of claim submission; and miscellaneous expenses such as notary, fax, postage, copying, mileage, and long-distance telephone charges.  In addition, those who spent more than four (4) hours researching or remedying issues related to the Data Security Incidents can document up to an additional five (5) hours of lost time at either $25 per hour, or if they missed work, at the rate of documented compensation, up to $50 per hour.  A claim for Documented Lost-Time must be filed as part of the claims for Out-of-Pocket Expenses,

supported by documentation, and will be subject to the individual cap of $10,000 for Out-of-Pocket Expenses.[5]

Plaintiffs' Counsel believe that the $60 million fund will be ample to pay the claims of Settlement Class Members.  However, if there are insufficient monies to pay all claims, claims for out-of-pocket losses and lost time will be reduced on a pro rata basis. (Nussbaum Decl. ¶ 72).  If monies remain in the Settlement Fund after the payment of all claims, attorneys' fees, costs, and expenses, and service awards to the Class Representatives, the remaining funds will be used to extend the coverage period for Aura's Financial Shield for all Settlement Class Members. No monies will revert to Morgan Stanley. (Nussbaum Decl. ¶ 72).

In addition, Morgan Stanley will be responsible for payment of all reasonable costs of notice and administration, presently estimated to be more than $8.2 million.  In the typical common fund class action settlement, the costs of notice and administration are deducted from the settlement fund; here, they are being paid by defendant separate and apart from the fund. SA at ¶ 2.3.  In addition to the business practice changes which includes Morgan Stanley's commitment to make ongoing investments in its technology decommissioning protocols, Morgan Stanley has agreed to hire Kroll Inc. to continue the IT device location and retrieval effort for a period of 12

---

[5]    Out-of-Pocket Expenses are capped at $10,000 per person. To the extent valid claims for Out-of-Pocket Expenses and Attested Lost-Time collectively exceed the amount remaining in the Settlement Fund after payments for Aura Financial Shield Services, service award payments approved by the Court, and attorneys' fees and expenses awarded by the Court, such claims for Out-of-Pocket Losses or Attested Time will be paid on a pro-rata basis.

To the extent valid claims for Out-of-Pocket Expenses and Attested Lost-Time collectively are less than the amount remaining in the Settlement Fund after payments for Aura's Financial Shield, service award payments approved by the Court, and attorneys' fees and expenses awarded by the Court, such excess funds shall be used to extend the duration of the Financial Shield services provided to Class Members that enroll within 24 months of the Effective Date of the Settlement.

months.  *Id.* at 7.2.

In total, the Settlement has a value of more than $68.2 million.  Plaintiffs' Counsel's request for an award of $20 million represents less than 29.3% of the total settlement value. (Nussbaum Decl. ¶ 2).

## LEGAL ARGUMENT

## I.   PLAINTIFFS' COUNSEL'S REQUESTED ATTORNEYS' FEE AWARD IS FAIR AND REASONABLE

### A.   Legal Standard

Federal Rule of Civil Procedure 23(h) provides that courts may award "reasonable attorney's fees and nontaxable costs that are authorized by law or the parties' agreement." Fed. R. Civ. P. 23(h). "It is well established that '[w]here an attorney succeeds in creating a common fund from which members of a class are compensated for a common injury inflicted on the class ... the attorneys whose efforts created the fund are entitled to a reasonable fee-set by the court-to be taken from the fund.'" *In re IMAX Sec. Litig.,* No. 06 Civ. 6128 (NRB), 2012 WL 3133476, at *5 (S.D.N.Y. Aug. 1, 2012) (quoting *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 136 (S.D.N.Y. 2008)). "The party seeking fees bears the burden of demonstrating that its requested fees are reasonable." *Abel v. Town Sports Int'l, LLC*, No. 09 Civ. 10388 (DF), 2012 WL 6720919, at *26 (S.D.N.Y. Dec. 18, 2012) (citing *Blum v. Stenson*, 465 U.S. 886, 897 (1984)). Any award of attorneys' fees "must reflect 'the actual effort made by the attorney to benefit the class.'" *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 249-250 (2d Cir. 2007) (quoting *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1099 (2d Cir. 1977)). Here, given the volume of work performed by Plaintiffs' counsel, especially in a limited time frame, and the benefits achieved on behalf of the Class that resulted from that effort, Plaintiffs' Counsel's request for attorneys' fees is reasonable and should be awarded.

The court "may award attorneys' fees in common fund cases under either the 'lodestar' method or the 'percentage of the fund' method." *McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 417 (2d Cir. 2010); *Goldberger v. Integrated Res.*, 209 F.3d 43, 50 (2d Cir. 2000). However, "[t]he trend in the Second Circuit is to assess a fee application using the 'percentage of the fund' approach, which 'assigns a proportion of the common settlement fund toward payment of attorneys' fees." *Jander v. Ret. Plans Comm. of IBM*, 2021 WL 3115709, at \*7 (S.D.N.Y. July 22, 2021) (quoting *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 2021 WL 76328, at \*4 (S.D.N.Y. Jan. 7, 2021)). *See also Wal-Mart Stores Inc. v. U.S.A. Inc.*, 396 F.3d 96, 122 (2d Cir. 2005) (noting that "[t]he trend in this Circuit is toward the percentage method, which 'directly aligns the interest of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation'") (internal quote omitted). This is particularly true in cases such as this one in which the Settlement provides for a common fund plus additional benefits, applicable to all Class members, to be paid by the Defendant outside the fund. *See Blum*, 465 U.S. at 900 n.16 (noting that in common fund cases, "a reasonable fee is based on a percentage of the fund bestowed on the class").

"As a 'cross-check on the reasonableness of the requested percentage,' however, courts may also look to the lodestar multiplier, which should be a reasonable multiple of the total number of hours billed at a standard hourly rate." *Jander*, 2021 WL 3115709, at \*7 (quoting *Lexmark*, 2021 WL 76328, at \*4).

Regardless of whether the percentage of the fund or lodestar method is used, courts in the Second Circuit evaluating the reasonableness of a fee request consider: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement;

and (6) public policy considerations." *Goldberger*, 209 F.3d at 50. Plaintiffs' Counsel respectfully submit that an analysis of the *Goldberger* factors, as well as the percentage of the fund and lodestar analyses herein, demonstrate that the fee and expense request is reasonable and appropriate and warrants approval by the Court.

### B.   This Court Should Apply the Percentage of the Fund Method in this Common Fund Case

"[T]he trend in this Circuit has been toward the use of a percentage of recovery as the preferred method of calculating the award for class counsel in common fund cases." *In re Beacon Assocs. Litig.*, No. 09 CIV. 3907 CM, 2013 WL 2450960, at *5 (S.D.N.Y. May 9, 2013). The trend of courts applying the percentage of the fund method to compensate class counsel for their time and effort is "firmly entrenched in the jurisprudence of this Circuit." *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 388 (S.D.N.Y. 2013).

Applying the percentage of the fund method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Wal-Mart*, 396 F.3d at 121; *accord Fresno Cty. Employees' Ret. Ass'n v. Isaacson/Weaver Family Tr.*, 925 F.3d 63, 71 (2d Cir. 2019) ("[O]nce the parties have agreed to settle, the percentage-of-the-fund methodology serves as important motivation for counsel to maximize the class's recovery, and, a fortiori, counsel's fee"); *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 348 (S.D.N.Y. 2014) (stating that the percentage method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of the litigation"); MANUAL FOR COMPLEX LITIGATION (Fourth) §14.121 (2004) ("Indeed, one purpose of the percentage method is to encourage early settlements by not penalizing efficient counsel, thus ensuring that competent counsel continue to be willing to undertake risky, complex, and novel litigation.") "In contrast, the 'lodestar [method] create[s] an

unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in gimlet-eyed review of line-item fee audits.'" *Id*. (quoting *Baffa v. Donaldson Lufkin & Jenrette Secs. Corp.*, 2002 WL 1315603, at *1 (S.D.N.Y. June 17, 2002)). The *Goldberger* court specifically described the difficulties with the lodestar method versus the percentage of the fund method:

> As so often happens with simple nostrums, experience with the lodestar method proved vexing. Our district courts found it created a temptation for lawyers to run up the number of hours for which they could be paid. For the same reason, the lodestar created an unanticipated disincentive to early settlements. But the primary source of dissatisfaction was that it resurrected the ghost of Ebenezer Scrooge, compelling district courts to engage in a gimleteyed review of line-item fee audits. There was an inevitable waste of judicial resources.

*Goldberger*, 209 F.3d at 48-49.

In contrast, the percentage of the fund method provides "appropriate financial incentives" necessary "to attract well-qualified plaintiffs' counsel who are able to take a case to trial," while also "directly align[ing] the interests of the class and its counsel" by providing "a powerful incentive for the efficient prosecution and early resolution of the litigation." *In re WorldCom, Inc. Sec. Litig.*, 338 F.Supp. 2d 319, 355, 359 (S.D.N.Y. 2005). This is particularly true here where Plaintiffs' Counsel litigated the case under an accelerated timeline and achieved a substantial settlement with significant benefits that might otherwise have taken more resources and multiple years in similarly complex actions.

C.  **The Fee Request is Reasonable Under the Percentage of the Fund Method**

In the Settlement Agreement, the Parties have agreed that Plaintiffs' Counsel may seek attorneys' fees. SA § 12. Accordingly, Plaintiffs' Counsel request a fee award of $20 million to be paid from the $60 million common fund. Notably, Plaintiffs' Counsel is asking for less than 29.3% of the value of the *total* proposed class settlement, which is at least $68.2 million. The value of

13

defendant's agreement to pay notice and administration costs (estimated to be at least $8.2 million) separate from the common fund plus defendant's commitment to retain Kroll to renew efforts to locate and retrieve missing IT assets should be considered when evaluating Plaintiffs' Counsel's fee request as those were items specifically negotiated as part of the Settlement and inure to the benefit of the entire Class. *See Velez v. Novartis Pharm. Corp.,* No. 04 CIV 09194 CM, 2010 WL 4877852, at *21 (S.D.N.Y. Nov. 30, 2010) ("The federal courts have established that a standard fee in complex class action cases like this one, where plaintiffs' counsel have achieved a good recovery for the class, ranges from 20 to 50 percent of the gross settlement benefit," which includes the value of both monetary and nonmonetary relief…."); *see also In re Warner Comm'ns. Secs. Litig,* 798 F.2d 35, 37 (2d Cir. 1986) (including costs of notice and administration as part of the total value of the settlement to the class); *see also In Re Marine Midland Motor Vehicle Leasing Litigation*, 155 F.R.D. 416, 419 (W.D.N.Y. 1994) (recognizing notice and claims administration costs as contributing to the total value of the settlement when determining attorneys' fees under a percentage of the fund method).

Under either the percentage-of-recovery or lodestar approach, Plaintiffs' Counsel respectfully submit that the request of less than 29.3% of the Settlement value is reasonable. *See* Fitzpatrick Declaration ¶ 14 ("[I]t is my opinion that all the Second Circuit factors support the fee request."). The fee request compensates Plaintiffs' Counsel for their investment of time, expertise, and capital, which produced an extraordinarily successful outcome for the Settlement Class in a case that was novel, complex and high risk. "The federal courts have established that a standard fee in complex class action cases like this one, where plaintiffs' counsel have achieved a good recovery for the class, ranges from 20 to 50 percent of the gross settlement benefit." *Velez*, 2010 WL 4877852, at *21. *See also In re Marsh ERISA Litig.*, 265 F.R.D. 128, 149 (S.D.N.Y. 2010)

("Traditionally, courts in this Circuit and elsewhere have awarded fees in the 20%–50% range in class actions." (internal quotes omitted)). "District courts in this Circuit typically approve fee requests between 30% and 33% of the settlement.'" *Hernandez v. Compass One, LLC*, 2021 WL 4925561, at *4 (S.D.N.Y. Oct. 21, 2021) (Liman, J.) (quoting *Strauss v. Little Fish Corp*., 2020 WL 4041511, at *9 n.1 (S.D.N.Y. July 17, 2020) (Liman, J.) (collecting cases)). In fact, "[i]n this district alone, there are *scores* of common fund cases where fees alone (i.e., where expenses are awarded in addition to the fee percentage) were awarded in the range of 33-1/3% of the settlement fund." *In re Lloyd's Am. Tr. Fund Litig*., 2002 WL 31663577, at *26 (S.D.N.Y. Nov. 26, 2002) (emphasis added; collecting cases). Indeed, "[d]istrict courts in the Second Circuit *routinely* award attorneys' fees that are 30 percent or greater." *Velez*, 2010 WL 4877852, at *21 (emphasis added). This is especially true in non-megafund cases, like this one. *See In re Marsh ERISA Litig.*, 265 F.R.D. at 149; *see also Pennsylvania Public School Employees' Retirement System v. Bank of America Corporation*, 318 F.R.D. 19, 25 (S.D.N.Y. 2016) (defining "mega funds" as funds in excess of $100 million). According to an empirical study conducted by Plaintiffs' Counsel's fee expert, Prof. Brian Fitzpatrick, federal courts nationwide commonly award 25%, 30%, and 33% of a settlement fund, with a mean award of 25.4% and a median award of 25%. See, Fitzpatrick Declaration ¶ 19 (citing *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010)).

Thus,  the fee request of Plaintiffs' Counsel is reasonable, consistent with many other fee awards granted in other class actions in this Circuit, and commensurate with the complexities and risks facing Plaintiffs' Counsel in bringing this suit.

### D.    A Lodestar-Multiplier "Cross-Check" Further Confirms the Reasonableness of Plaintiffs' Requested Fee

As noted above, the lodestar fee calculation method has "fallen out of favor particularly because it encourages bill-padding and discourages early settlements." *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 353 (S.D.N.Y. 2014). Accordingly, the lodestar method is used in this Circuit only "as a sanity check to ensure that an otherwise reasonable percentage fee would not lead to a windfall." *Id.* "[W]here used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger*, 209 F.3d at 50. Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case (as well as encouraged by the strictures of Rule 11)." *Silberblatt v. Morgan Stanley*, 524 F.Supp.2d 425, 434 (S.D.N.Y. Nov. 19, 2007) (internal citations omitted). Class Counsel need only submit documentation appropriate to meet the burden establishing an entitlement to an award, not to satisfy "green-eyeshade accountants." *Fox v. Vice*, 563 U.S. 826, 838 (2011).

Plaintiffs' Counsel collectively worked nearly 9,952.55 hours in this Litigation. (Nussbaum Decl. ¶ 96). At their usual and customary rates, and applying the rates in existence at the time the work was undertaken, these hours translate into approximately $7,188,210,81. (*Id.*) As such, Plaintiffs' Counsel's request for $20 million in attorneys' fees, represents a total multiplier of approximately 2.75.

"The lodestar is typically enhanced by an appropriate multiplier which accounts for a number of factors unique to the case, including the contingent nature of success and the quality of counsel's work." *Dial Corp. v. News Corp.*, 317, 433 F.R.D. 426 (S.D.N.Y. 2016). Plaintiffs' Counsel's requested multiplier is squarely within the range awarded by courts in this District, as well as across the country. *See, e.g.*, *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016) (approving attorneys' fees constituting a multiple of 6.36 times the lodestar); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013) ("Courts regularly

award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers."); *Asare v. Change Grp. of N.Y., Inc.*, No. 12 Civ. 3371 (CM), 2013 WL 6144764, at *19 (S.D.N.Y. Nov. 18, 2013) ("Typically, courts use multipliers of 2 to 6 times the lodestar."); *City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132 (CM), 2014 WL 1883494, at *13 (S.D.N.Y. May 9, 2014) (noting "lodestar multiples of over 4 are awarded by this Court"); *Maley v. Dale Global Techs. Corp.*, 186 F. Supp. 2d 358, 371 (S.D.N.Y. 2002) (describing a 4.65 lodestar multiple as "modest" and "fair and reasonable"); *In re RJR Nabisco, Inc. Sec. Litig.*, No. 88 Civ. 7905 (MBM), 1992 WL 210138, at *6-8 (S.D.N.Y. Aug. 24, 1992) (awarding a lodestar multiplier of 6); *Jander*, 2021 WL 3115709, at *7 (approving request for 30% of gross settlement (1.7 multiplier), noting that "multipliers of between 3 and 4.5 have been common"); *Capsolas v. Pasta Res. Inc.*, 2012 WL 4760910, at *9 (S.D.N.Y. Oct. 5, 2012) (awarding multiplier of 3.96); *Wal-Mart Stores, Inc.*, 396 F.3d at 123 ("Here, the lodestar yields a multiplier of 3.5, which has been deemed reasonable under analogous circumstances.").

Further, according to an empirical study conducted by Professor Brian Fitzpatrick, courts that did a lodestar crosscheck awarded percentages that resulted in multipliers ranging from .07 to 10.3 with a mean of 1.65 and a median of 1.34. *See* Fitzpatrick Declaration ¶ 24 (citing Fitzpatrick, Empirical Study, *supra* at 834). The other large-scale academic studies of class action fees, which were authored by Geoff Miller and the late Ted Eisenberg, are in agreement. *Id.* (internal citations omitted) (studies finding mean multiplier of 1.81 before 2009 and a mean multiplier of 1.48 since 2009)). But Miller and Eisenberg also found that multipliers tend to be higher in settlements with values as large as this one. *Id.* Thus, for example, their latest study found a mean multiplier of 2.72 for settlements above $67.5 million, and their older study found a mean of 2.70 for settlements between $69.6 million and $175.5 million. *Id.*

Therefore, Plaintiffs' Counsel respectfully submit that the lodestar cross-check supports the reasonableness of the requested fee award.

**E.**   **Plaintiffs' Counsel's Fee Request is Also Reasonable Under the Goldberger Factors**

In the Second Circuit, when evaluating whether a fee is reasonable, courts should consider: "'(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.'" *Goldberger*, 209 F.3d at 50. The Goldberger factors "need not be applied in a formulaic way" because each case is different and "in certain cases, one factor may outweigh the rest." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 301 (3d Cir. 2006).

**1.**   **Plaintiffs' Counsel Invested Substantial Time and Resources Over the Course of This Litigation**

Plaintiffs' Counsel have dedicated significant time, effort, and expense to this litigation, and they have done so entirely on a contingent basis. From the outset, Plaintiffs' Counsel understood that this would be a complex, expensive, and potentially lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and financial expenditures that vigorous prosecution of the case would require. Prior to filing suit, Plaintiffs' Counsel investigated a multitude of factual and legal issues related to Plaintiffs' potential claims and Defendant's potential defenses. Once this Court consolidated the eight putative class action lawsuits into *In re Morgan Stanley Data Security Litigation*, Case No. 1:20-cv-05914-AT (S.D.N.Y.) and appointed leadership, Class Counsel efficiently coordinated the efforts of all Plaintiffs' Counsel;[6] conducted extensive research and investigation; vetted and selected

---

[6] On September 17, 2020, the Honorable Analisa Torres entered an Order consolidating all related cases and appointing Co-Lead Class Counsel and an Executive Committee. (Doc. 26)

representative plaintiffs; retained data breach experts and investigators; and began to work on a consolidated complaint that focused on the unique, novel and evolving factual narrative as well as fundamental legal issues including standing, damages, accessibility, and the applicability of various state law statutes.

After this Court set a pretrial schedule, Plaintiffs promptly engaged in comprehensive party and non-party discovery. The amount of discovery that actually took place over the next nine months was extensive, involving party and non-party depositions, witness interviews, numerous document productions totaling over 163,300 pages, analysis and negotiation of numerous privilege logs, exchanges of expert materials, and third-party discovery involving nineteen third parties. As a result of the expedited and extensive discovery engaged in, the case proceeded very rapidly.

During this time, the parties began engaging in negotiations with the assistance of Judge Welsh. Concurrent with these negotiations, Plaintiffs continued to litigate and conduct intensive discovery, filing an 84-page Consolidated Class Action Complaint, interviewing and vetting the named plaintiffs, and conducting extensive factual and legal research with regard to Morgan

---

("Interim Leadership Order"). The structure proposed to and adopted by Judge Torres resulted from private ordering of all counsel for plaintiffs from all related actions. The Interim Leadership Order permitted all firms with plaintiffs in the litigation to choose the most appropriate level of staffing for the tasks required in this litigation." *See* Interim Leadership Order at ¶ 3. When proposing the leadership structure, Class Counsel identified the substantive areas in which Plaintiffs' counsel would be invited to provide assistance, including plaintiff vetting and pleadings, ESI protocol and written discovery, third party discovery, depositions, experts, law and briefing, and settlement. (ECF No. 24-1, p. 7). Consistent with this proposal and the Interim Leadership Order, the work performed by counsel other than Co-Lead Class Counsel was limited to these specific areas. Further, pursuant to the Interim Leadership Order, all tasks were performed at the direction of Co-Lead Class Counsel to ensure there would not be duplicative work. Additionally, all participating firms submitting monthly billing and expense reports pursuant to a protocol established by Co-Lead Class Counsel. (ECF No. 24-1, p. 16 )("Co-Lead Counsel will ensure the efficient management of this litigation by adopting a detailed time and expense protocol for the Executive Committee and other Plaintiffs' counsel."). These reports were reviewed in a timely manner to ensure accuracy and efficiency in the work being performed and recorded in the litigation. Nussbaum Decl. ¶ 6.

Stanley's duties to safeguard customer information, regulatory proceedings against Morgan Stanley and a former employee, prior bad acts, Morgan Stanley's privacy policies, document retention and destruction standards for financial advisors, the Department of Defense and Department of Commerce National Institute of Standards and Technology for Media Sanitation, jurisdictional issues, standing issues, potential causes of action, state privacy statutes, and damages.

The parties mediated with the Judge Welsh in person, for three full-day sessions, occurring over a period of several months. Detailed, lengthy mediation statements and other materials, such as expert reports, were prepared and exchanged prior to each session. In between mediation sessions, Plaintiffs continued to subpoena documents and witnesses, filed a Consolidated Amended Class Action Complaint that was over 100 pages and replete with allegations of facts developed in discovery, and briefed Morgan Stanley's motion to dismiss. Finally, after all three full-day mediation sessions as well as numerous calls with Judge Welsh and the submission of additional mediation letters and legal memoranda, the parties each accepted a Mediator's proposal through a double-blind process, entered into a Term Sheet resolving this matter, and jointly informed the Court of the settlement reached.

As previously noted, since the inception of this case, Plaintiffs' Counsel have dedicated 9,952.55 hours of attorney and other legal professional time through February 28, 2022. "Considering the complexity of class actions in general and the overall result obtained, the Court [should] find[] that the time spent by counsel is reasonable and supports the requested award." *Story v. SEFCU*, 2021 WL 736962, at *12 (N.D.N.Y. Feb. 25, 2021). Thus, this factor weighs in favor of this fee application.

2.   This Class Action Included Complex Legal Issues

The magnitude and complexity factor also supports the requested fee award. "[C]lass actions 'have a well-deserved reputation as being most complex.'" *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998). In cases that require more expertise, a larger percentage of the fund should be awarded to the lawyers who can competently prosecute the case. *See In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d 371, 379 (S.D.N.Y. 2013) ("The upshot is that the magnitude and complexity of the litigation also weigh in favor of a significant award."). This lawsuit is certainly no exception.

Plaintiffs' Counsel knew from their initial investigations that this litigation would involve extensive research on challenging and complex legal and factual claims in this unique data security class action. Data security and data breach cases across the country are presenting novel issues to the courts for consideration. The allegations in this case, however, demonstrated that this was not a typical data security incident. There was no "hacker" or third party alleged to have breached Morgan Stanley's computer network or even to have stolen Morgan Stanley servers. Rather, plaintiffs alleged two separate incidents, three years apart, where Morgan Stanley's lax inventory control systems caused it to lose track of and resell retired IT equipment containing the unencrypted PII of millions of Morgan Stanley's clients. The technical issues involved required forensic analysis by multiple experts retained by Plaintiffs as to the specific computer hardware at issue. The legal and factual issues involved the review of years' worth of invoices and internal documents and discovery pertaining to nineteen third parties to decipher what was supposed to happen during the decommissioning, what did happen, when Morgan Stanley had knowledge of what had happened, and what actions Morgan Stanley took as a result.

Prior to resolution, the parties briefed Morgan Stanley's motion to dismiss Plaintiffs' Consolidated Amended Complaint. Had negotiations failed, Morgan Stanley had potentially strong

arguments and defenses supporting dismissal. For instance, Morgan Stanley argued that Plaintiffs lacked injuries caused by or traceable to Defendant, that Plaintiffs' claims were barred by various defenses, including statute of limitations, and that Plaintiffs' complaint failed to plead a claim upon which relief could be granted. The factual and legal issues involved in this dispute are unquestionably complex and it is far from clear what the ultimate result would be if the case had proceeded to trial. *See, e.g., Story*, 2021 WL 736962, at \*13 ("Most class actions are inherently complex and settlement avoids the costs, delays, and multitudes of other problems associated with them.").

Thus, a fee award that accounts for the prosecution of litigation that was "extraordinary in both complexity and scope" is appropriate. *In re Holocaust Victim Assets Litig.*, No. CV 06-0983 (FB) (JO), 2007 WL 805768, at \*46 (E.D.N.Y. Mar. 15, 2007); *see also NASDAQ*, 187 F.R.D. at 477 ("There can be no doubt that this class action would be enormously expensive to continue, extraordinarily complex to try, and ultimately uncertain of result.").

       3.    <u>The Requested Fee is Warranted Based on the High-Risk Nature of the Litigation</u>

Plaintiffs' Counsel undertook significant risk in accepting this case on an entirely contingent basis, supporting the requested fee award. The Second Circuit "has identified the risk of success as perhaps the foremost factor to be considered in determining" reasonable attorneys' fees. *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 467 (S.D.N.Y. 2004); *see also In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 592 (S.D.N.Y. 2008) ("Courts have repeatedly recognized 'that the risk of the litigation' is a pivotal factor in assessing the appropriate attorneys' fees to award plaintiffs' counsel in class actions."). Courts in this Circuit have long recognized that the risk associated with a case bears heavily upon the determination of an appropriate fee award. *See In re Am. Bank Note Holographics*, 127 F. Supp. 2d 418, 432-33 (S.D.N.Y. 2001) ("[It

is] appropriate to take this [contingent fee] risk into account in determining the appropriate fee to award."). The risk of non-payment is especially high in class actions with contingent fee arrangements, like here. *See Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, No. 01-CV-11814 (MP), 2004 WL 1087261, at *3 (S.D.N.Y. May 14, 2004) ("Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation.").

"'No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.'" *Cates v. Trs. of Columbia Univ. in City of N.Y.*, 2021 WL 4847890, at *5 (S.D.N.Y. Oct. 18, 2021) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974)). The risk of non-payment is especially high in class actions with contingent fee arrangements, like here. *See Teachers' Ret. Sys. of La.*, 2004 WL 1087261, at *3 ("Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation.").

"It is well-established that litigation risk must be measured as of when the case is filed." *Goldberger*, 209 F.3d at 55. At the time of filing of this Action, there were complex issues of fact and law, which presented significant risks that continue through today. In particular, the claims asserted herein have been met with strong opposition in courts nationwide.  Due at least in part to their cutting-edge nature and the rapidly evolving law, data security cases like this one generally face substantial hurdles—even just to make it past the pleading stage. *See Hammond v. The Bank of N.Y. Mellon Corp.*, 2010 WL 2643307, at *1 (S.D.N.Y. June 25, 2010) (collecting data breach cases dismissed at the Rule 12(b)(6) or Rule 56 stage). In addition to the questions as to whether Plaintiffs' claims would survive a motion to dismiss, there was always a risk that Morgan Stanley

would successfully oppose class certification. *See Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 186 (W.D.N.Y. 2005) (noting that "[w]hile plaintiffs might indeed prevail [on a motion for class certification], the risk that the case might be not certified is not illusory"). Even if the Class was certified by the Court, Defendant could have then attempted to appeal the certification decision under Federal Rule of Civil Procedure 23(f) or argued for decertification as the litigation progressed. *See Chatelain v. Prudential-Bache Sec.*, 805 F. Supp. 209, 214 (S.D.N.Y. 1992) ("Even if certified, the class would face the risk of decertification.").

"Counsel should be rewarded for undertaking [those risks] and for achieving substantial value for the class." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 441 (E.D.N.Y. 2014); *see also Jermyn v. Best Buy Stores, L.P.*, No. 08 Civ. 214 CM, 2012 WL 2505644, at *10 (S.D.N.Y. June 27, 2012) ("[T]he risk of non-payment in cases prosecuted on a contingency basis where claims are not successful…can justify higher fees.").

Plaintiffs' Counsel were able to secure a significant settlement on behalf of Class members for complex claims asserted against Defendant. This was done despite the significant risks Plaintiffs faced in pursuing claims against such a corporate behemoth with substantial resources. As such, the Settlement is a direct result of Plaintiffs' Counsel's skills and dedication in this Action.

4.    Plaintiffs' Counsel Provided (and Continue to Provide) High-Quality Representation

When evaluating *Goldberger's* "quality of representation" factor, courts in the Second Circuit "review the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." *In re Merrill Lynch Tyco Rsch. Sec. Litig.*, 249 F.R.D. 124, 141 (S.D.N.Y. 2008). Plaintiffs' Counsel practice extensively in complex federal civil litigation, particularly the litigation of data

24

security class actions, and have successfully litigated these types of actions in courts throughout the country.

"[T]he quality of representation . . . may be measured in large part by the results that counsel achieved for the classes." *Payment Card*, 991 F. Supp. 2d at 441. Beyond general qualifications, this factor is satisfied by Plaintiffs' Counsel's obtaining a $60 million non-reversionary settlement fund on behalf of the Class as well as significant business practice changes, Morgan Stanley's commitment to hire Kroll to renew efforts to locate and retrieve missing devices, and the payment by defendant of notice and settlement administration costs, estimated to be greater than $8.2 million. Plaintiffs' Counsel's ability to obtain such a substantial recovery from an aggressive, well-funded defendant such as Morgan Stanley represented by zealous counsel is a testament to the skill with which Plaintiffs' Counsel have prosecuted this case. *See Fleisher v. Phoenix Life Ins. Co.*, No. 11-cv-8405 (CM), 2015 WL 10847814, at *22 (S.D.N.Y. Sept. 9, 2015) ("The quality of opposing counsel is also important in evaluating the quality of [Co] Lead Counsel's work.") (internal quotations omitted); *NASDAQ*, 187 F.R.D. at 489 (approving fee award where defense counsel included "the nation's biggest and best defense firms operating on a seemingly unlimited budget over a period of four years"); *WorldCom*, 388 F. Supp. 2d at 357-58 (finding that counsel "obtained remarkable settlements for the Class while facing formidable opposing counsel from some of the best defense firms in the country"); *In re Warner Comm'ns. Secs. Litig.*, 618 F. Supp. 735, 749 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) ("The quality of opposing counsel is also important in evaluating the quality of plaintiffs' counsels' work.").

Morgan Stanley is a multinational investment bank and financial services company with offices in more than 42 countries and more than 60,000 employees. The firm has an incredibly diverse clientele, consisting of corporations, governments, institutions, and individuals. Morgan

Stanley is represented in this litigation by Paul, Weiss, Rifkind, Wharton & Garrison ("Paul, Weiss"). Paul, Weiss is a multinational law firm widely recognized for its litigation skills. In 2021 alone, Paul, Weiss won seven Law360 "Practice Group of the Year" recognitions for its achievements in the Appellate, Banking, Life Sciences, Media & Entertainment, Mergers & Acquisitions, Technology, and, notably, Class Actions categories.[7] For nearly a year and a half, Paul, Weiss maintained constant pressure on Plaintiffs, presented two separate third party expert reports on the technical aspects of the Data Security Incidents, and filed a motion to dismiss the Action. Through it all, Plaintiffs' Counsel were able to rebut all issues raised by Morgan Stanley.

This settlement represents a highly favorable result for the Class attributable to the diligence, determination, and hard work by Plaintiffs' Counsel, who developed, litigated, and successfully negotiated the settlement against a highly-skilled and determined defense team backed by a client with substantial resources.

5. The Fee Request Is Reasonable in Relationship to the Settlement

This Goldberger factor compares the requested fee award to the settlement. "Courts have interpreted this factor as requiring the review of the fee request in terms of the percentage it represents of the total recovery." *Cates*, 2021 WL 4847890, at *7 (finding class counsel's request for one-third of settlement fund to be reasonable). *See also Wal-Mart Stores, Inc.*, 396 F.3d at ("the percentage used in calculating any given fee award must follow a sliding scale and must bear an inverse relationship to the amount of the settlement" (internal quotes omitted)). As previously discussed, in non-megafund cases like this one, "[c]ourts in this District routinely approve fee

---

[7] *Seven Paul, Weiss Practices Named Law360 "Practice Groups of the Year"*, Paul, Weiss, January 17, 2022, *available at* https://www.paulweiss.com/practices/transactional/corporate/awards-and-rankings/seven-paul-weiss-practices-named-law360-practice-groups-of-the-year?id=42163 (last accessed Mar. 25, 2022).

awards of one-third of the common fund or more." *Cates*, 2021 WL 4847890, at *7 (S.D.N.Y. Oct. 18, 2021) (collecting cases). *See also In re BHP Billiton Limited Securities Litigation*, No. 1:16-cv-01445-NRB, 2019 WL 1577313 at *2 (S.D.N.Y. Apr. 10, 2019) (this Court's finding that lead counsel's request for 30% of a $50,000,000 settlement fund was fair, reasonable, and consistent with similar awards within the Second Circuit).

### 6.   Public Policy Supports Approval of the Fee

Public policy also strongly supports the requested fee award. Without private counsel taking on the risk of this lawsuit and having the skill and resources to pursue the claims vigorously, the 15 million individuals making up the Settlement Class would have recovered nothing, and important public interests would not have been vindicated. "Class action lawyers level the playing field and overcome the enforcement gap that would otherwise exist in our country by aggregating non-viable and underinvested claims into effective litigation vehicles." Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*, 158 U. Pa. L. Rev. 2043, 2059 (2010). Awarding a reasonable percentage of the common fund properly motivates zealous enforcement of consumer protection laws and incentivizes skilled counsel to bring meritorious cases even where, at the outset, the prospect of any recovery is uncertain and the costs are daunting. *See WorldCom*, 388 F. Supp. 2d at 359 ("In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives.").

"Attorneys' fees should 'reflect the important public policy goal of providing lawyers with sufficient incentive to bring common fund cases that serve the public interest.'" *In re J.P. Morgan Stable Value Fund ERISA Litig.*, 2019 WL 4734396, at *3 (S.D.N.Y. Sept. 23, 2019) (quoting *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 399 (S.D.N.Y. 1999)). Fee awards "should also serve to encourage skilled counsel to represent those who seek redress for damages inflicted on

entire classes of persons, and to discourage future alleged misconduct of a similar nature." *Id.* (quoting *Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at *18 (S.D.N.Y. Mar. 24, 2014))

Plaintiffs' Counsel's efforts in this Action are the only way Plaintiffs will receive any compensation. Plaintiffs' counsel in such cases are typically retained on a contingent basis due to the massive commitment of time and expense required relative to the losses suffered by an individual representative plaintiff. Furthermore, the significant expense, combined with the high degree of uncertainty of ultimate success, means that contingent fees are virtually the only means of recovery in such cases. Plaintiffs' Counsel assumed substantial risk by undertaking this Action and achieved a significant benefit to the Class. An important public policy interest is served by awarding attorneys' fees adequately compensating counsel. Accordingly, public policy supports Plaintiffs' Counsel's requested fee.

### F.   The Reaction of Class Members Supports Plaintiffs' Counsel's Fee Request

The final factor that will confirm the reasonableness of Plaintiffs' Counsel's request is the reaction of Class Members to the settlement and the fee and litigation expense request. *See In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-CIV-8557 CM, 2014 WL 7323417, at *18 (S.D.N.Y. Dec. 19, 2014) ("In addition to the criteria set forth in *Goldberger*, courts in the Second Circuit consider the reaction of the class to the fee request in deciding how large a fee to award."). The Notice informed members of the Settlement Class that Plaintiffs' Counsel intended to seek a fee award of up to $33^1/_3$ % of the common fund. *See Long Form Notice*, ECF No. 81-2, pp. 114, 126. This motion is consistent with the information the Notice provided regarding the request for an award of fees and expenses.

Class Counsel will address all objections, including any to the requested fee award, with the motion for final approval and at the final approval hearing.

## II.   PLAINTIFFS' COUNSEL'S REQUEST FOR REIMBURSEMENT OF LITIGATION COSTS IS REASONABLE

Pursuant to Fed. R. Civ. P. 23(h), a trial court may award nontaxable costs that are authorized by law or the parties' agreement. Fed. R. Civ. P. 23(h). Here, an award of expenses incurred by Plaintiffs' Counsel is authorized by both the Settlement Agreement and the common fund doctrine. SA § 12; *see Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 392 (1970) (recognizing the right to reimbursement of expenses where a common fund has been produced or preserved for the benefit of a class); Alba Conte, *Attorney Fee Awards* § 2.08, at 50-51 (3d ed. 2004); *In re Vitamin C Antitrust Litig.*, No. 06-MD-1738 (BMC) (JO), 2012 WL 5289514, at *11 (E.D.N.Y. Oct. 23, 2012) ("Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course.").

Reimbursable expenses include expert fees, travel, conference telephone, postage, delivery services, and computerized legal research." *Cates*, 2021 WL 4847890, at *8 (citing Alba Conte, 1 Attorney Fee Awards § 2:19 (3d ed. 2004)). *See also Fleisher*, 2015 WL 10847814, at *23 (noting as typical expenses in complex cases "fees paid to experts, mediation fees, notice costs, computerized research, document production and storage, court fees, reporting services, and travel in connection with th[e] litigation").

Here, Plaintiffs' Counsel have incurred $253,994.53 in reasonable and necessary litigation costs and expenses. (Nussbaum Decl. ¶ 100). These expenses include filing, general litigation, and mediation-related expenses that were all incurred in the normal course of business and were essential to the successful prosecution of this lawsuit. None of Plaintiffs' Counsel's expenditures have yet been reimbursed. Indeed, "[t]he fact that Class Counsel was willing to expend their own money, where reimbursement was entirely contingent on the success of this litigation, is perhaps the best indicator that the expenditures were reasonable and necessary." *Fleisher*, 2015 WL

10847814, at *19. The majority of expenses were incurred by Plaintiffs' Counsel in the hiring of experts and conducting discovery.  The expenses of Plaintiffs' Counsel were submitted monthly and reviewed by Class Counsel and were found to be reasonable. In sum, there is "no reason to depart from the common practice in this circuit of granting expense requests." *In re Visa Check/Mastermoney Antitrust Litig*., 297 F. Supp. 2d 503, 525 (E.D.N.Y. 2003), *aff'd sub nom*., *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 121 (2d Cir. 2005). Plaintiffs' Counsel therefore respectfully request that litigation costs and expenses in the amount of $253,994.53 be reimbursed.

### III.   PLAINTIFFS' REQUEST FOR MODEST SERVICE AWARDS IS REASONABLE

Consistent with the Settlement Agreement, Plaintiffs seek a modest $5,000 service award for each of the eleven named Plaintiffs for their active participation in this Action. In the Second Circuit, plaintiff service awards "are common in class action cases and are important to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant and any other burdens sustained by plaintiffs." *DeLeon v. Wells Fargo Bank, N.A.*, No. 12 Civ. 4494 (RLE), 2015 WL 2255394, at *7 (S.D.N.Y. May 11, 2015). Service awards are within the discretion of the court and amounts awarded vary considerably depending on time spent and risks incurred by named plaintiffs and the size and scope of the recovery. *See, e.g., Dornberger v. Metro. Life Ins. Co*., 203 F.R.D. 118, 125 (S.D.N.Y. 2001) ($2,500 to $85,000 may be reasonable depending on participation in the action).[8]

---

[8]  *See also Guippone v. BH S&B Holdings, LLC*, 2011 WL 5148650 (S.D.N.Y. Oct. 28, 2011) ($10,000 award approved in a settlement of approximately $900,000 for a class of approximately 300 members); *Sand v. Greenberg,* 2011 WL 1338196 (S.D.N.Y. Mar. 22, 2011) ($10,000 service award "reasonable" and "very similar to allocation plans that courts routinely approve in the context of settlement"); *Dupler v. Costco Wholesale Corp*., 705 F. Supp. 2d 231, 245-46 (E.D.N.Y. 2010) (awarding $25,000 to lead plaintiff in consumer class action and $5,000 to another plaintiff); *In re Currency Conversion Fee Antitrust Litig*., 263 F.R.D. 110, 131 (S.D.N.Y. 2009) ($45,000

As the Court noted in *In re LIBOR -Based Financial Instruments Antitrust Litigation*: " 'Awards on an individualized basis have generally ranged from $2,500 to $85,000,' " No. 11 MD 2262 (NRB), 2018 WL 3863445, at *2 (S.D.N.Y. Aug. 14, 2018) (quoting *Dial Corp.*, 317 F.R.D. at 439)). "[E]mpirical studies have shown that, in recent years, the median incentive award per plaintiff is approximately $5,000 and the mean incentive award is approximately $12,000." *Id.* (citing 5 William B. Rubenstein, Newberg on Class Actions § 17:8 tbl.1 (5th ed.) (Westlaw 2018)).

"In examining the reasonableness of service awards, courts consider: (1) the personal risk incurred by the named plaintiff; (2) time and effort expended by the named plaintiff in assisting the prosecution of the litigation; and (3) the ultimate recovery in vindicating statutory rights." *Id.* All three factors support the requested service awards. Plaintiffs agreed to bring this action in their name without any assurance that it would be successful. Plaintiffs also expended valuable time and effort in the ligation. Among other things, Plaintiffs carefully reviewed pleadings (including the complaint and amended complaint), regularly communicated with Plaintiffs' Counsel to keep abreast of the developments, and participated in settling of the case. (Nussbaum Decl. ¶¶ 103-104). Plaintiffs gave their permissions to allow Plaintiffs' retained experts to search for their personal data on the retrieved devices, as well as the dark web. (*Id.* ¶ 104).

Each of the Plaintiffs has served the Settlement Class well. They lent their names to this case and thereby subjected themselves to public attention, including being forever linked to the litigation in any internet searches using their names, and publicizing the fact that their PII had been stolen, bolstering any credibility that a nefarious actor might seek to gain by selling this information or using it for ill-gotten gains. In addition, each of them participated in numerous

---

and $35,000 service awards are "within the range of what other courts have found to be reasonable, although on the higher end").

conferences with their attorneys, produced relevant documents and information, and evaluated and support the proposed settlement.

Accordingly, Plaintiffs' request for $5,000 service awards for each of the Plaintiffs is reasonable and should be approved.

## CONCLUSION

For the foregoing reasons, Plaintiffs and their Counsel respectfully request that the Court approve the request for: (i) the payment of attorneys' fees in the amount of $20 million; (ii) reimbursement of reasonable and necessary litigation expenses in the amount of $253,994.53; and (iii) a $5,000 service award for each of the named Plaintiffs ($55,000 total).

Dated: April 20, 2022

Respectfully submitted,

**MORGAN & MORGAN**

By: *_/s/ Jean S. Martin_*
Jean S. Martin
Ryan J. McGee
Francesca Kester
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 223-5505
jmartin@ForThePeople.com
rmcgee@ForThePeople.com
fkester@ForThePeople.com

**NUSSBAUM LAW GROUP, P.C.**

By: *_/s/ Linda P. Nussbaum_*
Linda P. Nussbaum
Susan R. Schwaiger
1211 Avenue of the Americas, 40th Fl.
New York, NY 10036
(917) 438-9189
lnussbaum@nussbaumpc.com
sschwaiger@nussbaumpc.com

*Co-Lead Counsel for Plaintiffs and Proposed Class Counsel*