Anna St. John
HAMILTON LINCOLN LAW INSTITUTE
  CENTER FOR CLASS ACTION FAIRNESS
1629 K Street NW, Suite 300
Washington, DC 20006
Phone: (917) 327-2392
Email:  anna.stjohn@hlli.org

*Attorney for Objector Robina Frank*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| *In re Morgan Stanley Data Security Litigation* | Case No. 1:20-cv-05914 (MKV) |

**DECLARATION OF THEODORE H. FRANK**

I, Theodore H. Frank, declare as follows:

1.      I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2.      My full name is Theodore Harold Frank. My business address is Hamilton Lincoln Law Institute, 1629 K St. NW, Suite 300, Washington, DC 20006. My telephone number is (703) 203-3848. My email address is ted.frank@hlli.org.

3.      Hamilton Lincoln Law Institute ("HLLI") and its attorneys, of which I am one, represent the objector in this matter. The objector is my mother.

4.      In my experience, class counsel often responds to HLLI objections by making a variety of *ad hominem* attacks, often wildly false. The vast majority of district court judges do not fall for such transparent and abusive tactics. Because the objection deadline is so close to the fairness hearing, we might not have a chance to supplement the record if class counsel engages in such tactics to distract from the merits of the objection. In an effort to anticipate such attacks and to avoid collateral litigation over a right to file a reply, this declaration discusses the history of HLLI and refutes the most common *ad hominems*. If the Court is inclined to disregard the *ad hominem* attacks, it can avoid these collateral disputes entirely and the discussion below will be irrelevant. *See In re Stericycle Sec. Litig.*, 35 F.4th 555, 572 (7th Cir. 2022) (criticizing *ad hominem* arguments and noting that my "track record" of success "speaks for itself"); *Pearson v. Target Corp.*, 968 F.3d 827, 831 (7th Cir. 2020) ("[T]he merits of an objection are relevant, not amateurism or experience").

### Center for Class Action Fairness

5.      I graduated the Law School at the University of Chicago in 1994 with high honors, and was a member of the Order of the Coif and the Law Review. I clerked for a federal judge on the U.S. Court of Appeals for the Seventh Circuit, and was elected to the American Law Institute in 2008. I've testified before Congress several times about class-action and other issues, and the

Federal Rules Committee invited me to speak to the subcommittee considering possible amendments to Rule 23.

6. I founded the non-profit Center for Class Action Fairness ("CCAF"), which eventually became a 501(c)(3) non-profit public-interest law firm based out of Washington, DC, in 2009. In 2015, CCAF merged into the non-profit Competitive Enterprise Institute ("CEI") and became a division within their law and litigation unit. In January 2019, CCAF became part of HLLI, a new 501(c)(3) non-profit public-interest law firm that Melissa Holyoak and I founded in 2018. Ms. Holyoak left HLLI in 2020 to become the Solicitor General of Utah.

7. CCAF's mission is to litigate on behalf of class members against unfair class action procedures and settlements. *See, e.g., Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014) (praising CCAF's work); *In re Dry Max Pampers Litig.*, 724 F.3d 713, 716-17 (6th Cir. 2013) (describing CCAF's client's objections as "numerous, detailed and substantive") (reversing settlement approval and certification); *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 205 (D.D.C. 2013) (describing CCAF's client's objection as "comprehensive and sophisticated" and noting that "[o]ne good objector may be worth many frivolous objections in ascertaining the fairness of a settlement") (rejecting settlement approval and certification). CCAF has won over 200 million dollars for class members and received national acclaim for its work. *See, e.g., McDonough v. Toys "R" Us, Inc.*, 80 F. Supp. 3d 626 (E.D. Pa. 2015) (approving amended settlement that enhanced class recovery by about $15 million); Roger Parloff, *Should Plaintiffs Lawyers Get 94% of a Class Action Settlement?*, FORTUNE, Dec. 15, 2015 ("the nation's most relentless warrior against class-action fee abuse"); The Editorial Board, *The Anthem Class-Action Con*, WALL ST. J., Feb. 11, 2018 (opining "[t]he U.S. could use more Ted Franks" while covering CCAF's role in exposing "legal looting" in the Anthem data breach MDL). *Cf. also Eubank v. Pella Corp.*, No. 1:06-cv-04481 Dkt. 770 (N.D. Ill. Mar. 15, 2019) (calling me "a well-known and well-respected class action lawyer" in a non-CCAF/non-HLLI case). A court in a case where we did not appear gratuitously praised CCAF. *Shah v. Zimmer Biomet Holdings*, 2020 WL 5627171, 2020 U.S. Dist. LEXIS 171925 (N.D. Ind. Sept. 18, 2020).

8. CCAF has been successful, winning reversal or remand in over twenty federal appeals decided to date in courts of appeals and the Supreme Court. *E.g., Frank v. Gaos*, 139 S. Ct. 1041 (2019); *In re Stericycle Sec. Litig.*, 35 F.4th 555 (7th Cir. 2022); *McKinney-Drobnis v. Oreshack*, 16 F.4th 594 (9th Cir. 2021); *Briseño v. Henderson*, 998 F.3d 1014 (9th Cir. 2021); *Berni v. Barilla S.P.A*, 964 F.3d 141 (2d Cir. 2020); *Pearson v. Target Corp.*, 968 F.3d 827 (7th Cir. 2020); *In re Lithium Ion Batteries Antitrust Litig.*, 777 Fed. Appx. 221 (9th Cir. 2019) (unpublished); *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316 (3d Cir. 2019); *In re EasySaver Rewards Litig.*, 906 F.3d 747 (9th Cir. 2018); *Pearson v. Target Corp.*, 893 F.3d 980 (7th Cir. 2018); *In re Subway Footlong Mktg. Litig.*, 869 F.3d 551 (7th Cir. 2017); *In re Target Corp. Customer Data Sec. Breach Litig.*, 847 F.3d 608 (8th Cir. 2017); *In re Walgreen Co. Stockholder Litig.*, 832 F.3d 718 (7th Cir. 2016); *In re EasySaver Rewards Litig.*, 599 Fed. Appx. 274 (9th Cir. 2015) (unpublished); *In re BankAmerica Corp. Secs. Litig.*, 775 F.3d 1060 (8th Cir. 2015); *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014); *Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014); *In re MagSafe Apple Power Adapter Litig.*, 571 Fed. Appx. 560 (9th Cir. 2014) (unpublished); *In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013); *In re HP Inkjet Printer Litigation*, 716 F.3d 1173 (9th Cir. 2013); *In re Baby Products Antitrust Litigation*, 708 F.3d 163 (3d Cir. 2013); *Dewey v. Volkswagen*, 681 F.3d 170 (3d Cir. 2012); *Robert F. Booth Trust v. Crowley*, 687 F.3d 314 (7th Cir. 2012); *Nachshin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011). While, like most experienced litigators, we have not won every appeal we have litigated, CCAF has won the majority of them, even though appellants in private civil cases typically prevail less than 15% of the time, and non-CCAF class-action settlement objectors even less so. That CCAF and I have won the majority of our appeals against far-better-funded opposition (and usually two sets of appellees' briefs), even though most of our cases raise novel issues and seek to create new law, is, I submit, extraordinary evidence of the good faith of our project. In recent years, though there are still weeks where I argue two appeals on consecutive days, I have doled out a substantial percentage of appellate oral arguments to other CCAF attorneys, and I am proud that four other

CCAF attorneys besides me have won appellate oral arguments, and that one went on to become Utah Solicitor General.

9. HLLI and CCAF achieve success or partial success in the vast majority of their objections, and have won hundreds of millions of dollars for class members, as well as numerous landmark appeals. We regularly represent law professors in court, and have been appointed *amicus* in district court and appellate court proceedings where there was no adversary presentation. *E.g.*, *Arkansas Teacher Retirement Sys., v. State Street Corp.*, 25 F.4th 55 (1st Cir. 2022). HLLI began court appearances in 2019. CCAF began existence in 2009. Frank, CCAF, and HLLI, and their attorneys have never been sanctioned in the last five years or otherwise.

10. HLLI pays me on a salary basis that does not vary with the result in any case. HLLI and CCAF attorneys do not receive a contingent bonus based on success in any case, a structure that would be contrary to I.R.S. restrictions.

11. CCAF has won more than $200 million for class members by driving the settling parties to reach an improved bargain or by reducing outsized fee awards. Andrea Estes, *Critics hit law firms' bills after class-action lawsuits*, Boston Globe (Dec. 17, 2016) (more than $100 million at time). *See also, e.g., McDonough v. Toys "R" Us*, 80 F. Supp. 3d 626, 661 (E.D. Pa. 2015) ("CCAF's time was judiciously spent to increase the value of the settlement to class members") (internal quotation omitted); *In re Citigroup Inc. Secs. Litig.*, 965 F. Supp. 2d 369 (S.D.N.Y. 2013) (reducing fees, and thus increasing class recovery, by more than $26 million to account for a "significantly overstated lodestar"); *In re Apple Inc. Sec. Litig.*, No. 5:06-cv-05208-JF, 2011 U.S. Dist. LEXIS 52685 (N.D. Cal. May 17, 2011) (parties nullify objection by eliminating *cy pres* and augmenting class fund by $2.5 million).

### Pre-empting *Ad Hominem* Attacks

12. Class counsel often try to tar CCAF as "professional objectors" or "serial objectors" and then cite court opinions using those terms of art to criticize for-profit attorneys who threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a share of attorneys' fees. But

this is not the non-profit CCAF's *modus operandi*, so the court opinions class counsel rely upon to tar CCAF are inapposite. *See* Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. Chi. Legal F. 403, 437 n. 150 (public interest groups are not "professional objectors"); Paul Karlsgodt & Raj Chohan, *Class Action Settlement Objectors: Minor Nuisance or Serious Threat to Approval*, BNA: Class Action Litig. Report (Aug. 12, 2011) (distinguishing CCAF from "professional objectors"). CCAF refuses to engage in *quid pro quo* settlements and has never withdrawn an objection in exchange for payment. Instead, it is funded entirely through charitable donations and court-awarded attorneys' fees. The difference between a for-profit "professional objector" and a public-interest objector is a material one. As the federal rules are currently set up, "professional objectors" have an incentive to file objections regardless of the merits of the settlement or the objection. In contrast, a public-interest objector such as myself has to triage dozens of requests for pro bono representation and dozens of unfair class action settlements, loses money on every losing objection (and most winning objections) brought, can only raise charitable donations necessary to remain afloat by demonstrating success, and has no interest in wasting limited resources and time on a "baseless objection." CCAF represents clients as objectors in only a small fraction of the number of unfair class action settlements and fee requests it sees.

13. While one district court called me a "professional objector" in a broader sense, that court stated that it was not meant pejoratively, and awarded CCAF fees for a successful objection and appeal that improved the settlement for the class. *Dewey v. Volkswagen*, 909 F. Supp. 2d 373, 396 n.24 (D.N.J. 2012). Similarly, the Seventh Circuit in *In re Subway Footlong Mktg. Litig.*, 869 F.3d 551 (7th Cir. 2017) referred to me non-pejoratively as a "professional objector" in an opinion agreeing with my objection and reversing a settlement approval and class certification.

14. In *In re Equifax, Inc. Customer Data Breach Litigation*, No. 17-md-2800-TWT (N.D. Ga.), the district court's approval order stated that I am a "serial objector" who objected merely to benefit myself or my attorney. It further accused me of making "false and misleading" statements about the settlement. The order did not cite any evidence or reason to support this

finding, did not identify any specific statements it deemed "false" or "misleading," and I have reason to believe the court used this language only because it adopted verbatim a proposed order that was submitted *ex parte* by plaintiffs' counsel, without exercising independent judgment to make these findings. The allegation made by the district court is false. I still believe our objection in *Equifax* was meritorious, similar to successful objections we've made elsewhere that have won millions of dollars for class members, and was supported on appeal by an amicus brief by a prominent plaintiffs' attorney that agreed with our analysis. A leading Supreme Court law firm offered to represent us in a petition for certiorari *pro bono*. *Watkins v. Spector*, No. 21-638. I did not make any false or misleading statements about the settlement, and on appeal, plaintiffs failed to identify any false or misleading statements I made and admitted that I have never engaged in extortion. The Eleventh Circuit did not resolve this question, holding that the criticism was dicta.

15. In *Exum v. National Tire and Battery*, No. 9:19-cv-80121 (S.D. Fla.), one of HLLI's attorneys mistakenly misconstrued the release clause in the settlement agreement and filed an objection with an argument that relied on that erroneous reading. Once she became aware of the error, she withdraw that portion of the objection and has publicly expressed contrition and embarrassment that her work did not live up to the high standards she sets for herself. The district court issued an order to show cause why she should not be sanctioned, stating that the "false statements and representations" "appear[] to be reckless or negligent." The court also referred to the HLLI attorney as a "serial" or "professional" objector but made no finding that she or any other HLLI attorney has ever withdrawn an objection in exchange for payment. HLLI filed a response to the order explaining that this error was made in good faith, with no intent to delay or otherwise interfere with the court proceedings and again expressing contrition. The court subsequently issued an order discharging the order to show cause in which it stated that "it is clear to the Court that [the HLLI attorney] does hold herself to high standards" and the court was "satisfied and impressed" by HLLI's "prompt and candid response." The court found that the HLLI attorney "did not engage in bad faith conduct and did not knowingly or intentionally make a false statement or

misrepresentation to the Court." The HLLI attorney, Ms. Holyoak, has since left HLLI to become Solicitor General of Utah.

16. CCAF feels strongly enough about the problem of bad-faith objectors profiting at the expense of the class through extortionate means that it successfully initiated litigation to require such objectors to disgorge their ill-gotten gains to the class. *See Pearson v. Target Corp.*, 968 F.3d 827 (7th Cir. 2020); *see also Rougvie v. Ascena Retail Grp., Inc.*, No. 15-cv-724, 2019 U.S. Dist. LEXIS 28229 (E.D. Pa. Feb. 21, 2019); *see generally* Alison Frankel, *Class counsel want to pay objector $25K to ditch appeal. Ted Frank is in their way.*, Reuters, Feb. 11, 2022; Jacob Gershman, *Lawsuits Allege Objector Blackmail in Class Action Litigation*, Wall St. J., Dec. 7, 2016.

17. Before I joined CEI, I had a private practice unrelated to my non-profit work. One of my former clients, Christopher Bandas, is a professional objector who has settled objections and withdrawn appeals for cash payments. I withdrew from representation of Mr. Bandas in 2015 when he undertook steps that interfered with my non-profit work. Mr. Bandas was criticized by the Southern District of New York after I ceased to represent him, and class counsel in other cases often cites that language and attempts to attribute it to me. Class counsel in multiple cases, using boilerplate language, has tried to make it seem like my paid representation of Mr. Bandas was somehow scandalous, using language like "forced to disclose" and "secret." The sneering is false: my representation of Mr. Bandas was not secret, as I filed declarations in my name on his behalf in multiple cases, noting under oath that I was being paid to perform legal work for him; I filed notices of appearances in cases where he had previously appeared; and my declaration in the *Capital One* case ending the relationship was filed voluntarily at great personal expense to myself, as I had been offered and refused to take a substantial sum of money to accede to a Lieff Cabraser fee award of over $3400/hour. I only worked for Mr. Bandas in cases where I believed there was a meritorious objection to be made, had no role in any negotiations he made to settle appeals, and my pay was flat-rate or by the hour and not tied to his ability to extract settlements. I argued two appeals for Mr. Bandas, and won both of them. There is nothing scandalous about that, unless one believes it is scandalous for an attorney to be paid to perform successful high-quality legal services

for a client. CCAF had no attorney-client relationship with Mr. Bandas, and Mr. Bandas never paid CCAF, other than for his share of printing expenses when he was an independent co-appellant representing clients unrelated to CCAF. As it turns out, the payments Mr. Bandas made to me were entirely offset by court-awarded attorneys' fees in one of the successful objections I argued on his behalf in the Seventh Circuit that resulted in a substantially improved settlement on remand. *Eubank v. Pella Corp.*, No. 1:06-cv-04481 Dkt. 770 (N.D. Ill. Mar. 15, 2019).

18.     Firms whose fees we have objected to have previously cited to *City of Livonia Employees' Ret. Sys. v. Wyeth*, No. 07 Civ 10329 (RJS), 2013 WL 4399015 (S.D.N.Y. Aug. 7, 2013), in efforts to tar CCAF. While the *Wyeth* court did incorrectly criticize our client's objection as "frivolous" (after mischaracterizing the nature of that objection and incorrectly finding that he did not have standing to challenge a settlement that froze him out of the settlement claims process because he did not make a futile claim), it ultimately agreed with our client that class counsel's fee request was too high and reduced it by several million dollars to the benefit of shareholder class members. *Compare* Dkt. 111-1 at 8 (falsely characterizing Petri as claiming that class counsel did not have any measurable risk and that any multiplier would be inappropriate) *with* Dkt. 111-2 at 3-11 (quantifying risk in detail with empirical evidence and measuring and proposing a substantial multiplier that would compensate class counsel for that risk, while noting that the court had the discretion to not award a multiplier at all given the recovery of $0.16/share for an alleged $4.98/share of damage) *and* Daniel Fisher, *A Brief Explanation Of The Economics Of Securities Lawsuits*, Forbes (Jan. 25, 2013) (praising the economic analysis and discussion of risk in Petri's objection). *Compare also* Dkt. 111-2 at 4-5 (citing *Goldberger*) *with* Dkt. 111-1 at 6-9 (agreeing with our objection without crediting it that *Goldberger* factors did not support a 25% award). But the district court did not actually sanction us, so we could not appeal the incorrect critical language in the decision. We did not appeal the substantive result, because we had achieved the majority of what we sought to achieve in that case.

19.     Adversaries frequently cite a decade-old case, *Lonardo v. Travelers Indemnity Co.*, 706 F. Supp. 2d 766, 804 (N.D. Ohio 2010), where the district court criticized a policy-based

argument by CCAF as supposedly "short on law"; however, CCAF ultimately was successful in the Seventh and Ninth Circuits on that same argument. *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) (agreeing that reversionary clauses are a problematic sign of self-dealing); *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014) (same). Moreover, the court in *Lonardo* stated its belief that "Mr. Frank's goals are policy-oriented as opposed to economic and self-serving" and even awarded CCAF about $40,000 in attorneys' fees for increasing the class benefit by $2 million. *Lonardo*, 706 F. Supp. 2d at 813-17.

20.   CCAF has no interest in pursuing "baseless objections," because every objection we bring on behalf of a class member has the opportunity cost of not having time to pursue a meritorious objection in another case. We are confronted with many more opportunities to object (or appeal erroneous settlement approvals) than we have resources to use, and make painful decisions several times a year picking and choosing which cases to pursue, and even which issues to pursue within the case. CCAF turns down the opportunity to represent class members wishing to object to settlements or fees when CCAF believes the underlying settlement or fee request is relatively fair. This is especially true now that HLLI has expanded into successful litigation over other issues that our attorneys care about, such as freedom of speech and regulatory abuse. *See, e.g., CEI v. FCC*, 970 F.3d 372 (D.C. Cir. 2020); *Greenberg v. Haggerty*, 491 F. Supp. 3d 12 (E.D. Pa. 2020) (preliminarily enjoining rule of professional conduct that would chill free speech, which the defendant appealed but subsequently dismissed).

21.   While I am often accused of being an "ideological objector," the ideology of CCAF's objections is merely the correct application of Rule 23 to ensure the fair treatment of class members. Likewise, I have often seen class counsel assert that I oppose all class actions and am seeking to end them, not improve them. The accusation—aside from being utterly irrelevant to the legal merits of any particular objection—has no basis in reality. I have been writing and speaking about class actions publicly for nearly a decade, including in testimony before state and federal legislative subcommittees, and I have never asked for an end to the class-action device, just proposed reforms for ending the abuse of class actions and class-action settlements. That I oppose

class-action abuse no more means that I oppose class actions than someone who opposes food poisoning opposes food. As a child, I admired Ralph Nader and consumer reporter Marvin Zindler (whose autographed photo was one of my prized childhood possessions), and read every issue of *Consumer Reports* from cover to cover. I have focused my practice on conflicts of interest in class actions because, among other reasons, I saw a need to protect consumers that no one else was filling, and as a way to fulfill my childhood dream of being a consumer advocate. I have frequently confirmed my support for the principles behind class actions in declarations under oath, interviews, essays, and public speeches, including a January 2014 presentation in New York that was broadcast nationally on C-SPAN and in my briefing in *Frank v. Gaos*. On multiple occasions, successful objections brought by CCAF have resulted in new class-action settlements where the defendants pay substantially more money to the plaintiff class without CCAF objecting to the revised settlement. And I was the putative class representative in a federal class action, represented by a prominent plaintiffs' firm. *Frank v. BMOCorp., Inc*., No. 4:17-cv-870 (E.D. Mo.).

22.     On October 1, 2015, after consultation with its board of directors and its donors, CCAF merged with the much larger Competitive Enterprise Institute ("CEI"). Prior to its merger with CEI, CCAF never took or solicited money from corporate donors other than court-awarded attorneys' fees. CEI, which is much larger than CCAF, does take a percentage of its donations from corporate donors. As part of the merger agreement, I negotiated a commitment that CEI would not permit donors to interfere with CCAF's case selection or case management. In the event of a breach of this commitment, I was permitted to treat the breach as a constructive discharge entitling me to substantial severance pay. CCAF attorneys made several filings in several cases opposed by CEI donors.

23.     CEI was willing to merge with CCAF because it supported CCAF's pro-consumer mission and success in challenging abusive class-action settlements and fee requests. But it is a large organization affiliated with dozens of scholars who take a variety of controversial positions. Neither I nor CCAF's clients agree with all of those positions, and they should not be ascribed to

me, my clients, or this objection, any more than my support for a Pigouvian carbon tax should be ascribed to CEI scholars who have publicly opposed that position.

24. CCAF has since left CEI, and is now part of the Hamilton Lincoln Law Institute, which receives no corporate funding. We did not consult any of our donors about our objection to this settlement. None of our donors has any say in our class-action case selection. HLLI does not receive funding from the Koch Brothers or the Chamber of Commerce or George Soros. We'd be happy to accept such funding, and don't think there's anything wrong with it, but they haven't offered.

25. Some class counsels have accused us of improper motivation because CCAF has on occasion sought attorneys' fees. While CCAF is funded entirely through charitable donations and court-awarded attorneys' fees, the possibility of a fee award never factors into the Center's decision to accept a representation or object to an unfair class-action settlement or fee request.

26. CCAF's history in requesting attorneys' fees reflects this approach. Despite having made dozens of successful objections and having won over $200 million on behalf of class members, CCAF has not requested attorneys' fees in the majority of its cases or even in the majority of its appellate victories. CCAF regularly passes up the opportunity to seek fees to which it is legally entitled. In *Classmates*, for example, CCAF withdrew its fee request and instead asked the district court to award money to the class; the court subsequently found that an award of $100,000 "if anything" "would have undercompensated CCAF." *In re Classmates.com Consol. Litig.*, No. 09-cv-0045-RAJ, 2012 WL 3854501, at *11 (W.D. Wash. June 15, 2012). In other cases, CCAF has asked the court for a fraction of the fees to which it would be legally entitled based on the benefit CCAF achieved for the class and asked for any fee award over that fractional amount be returned to the class settlement fund. In *Petrobras*, despite winning tens of millions of dollars for the class, we requested less than $200,000 in fees. In *Wells Fargo*, our good-faith objection on behalf of a shareholder aided the court in increasing benefit to shareholders by $15 million, and we requested only $250,000 (and received under $100,000) in fees through a court approval process—even though a fellow objector in the same case negotiated and received a

payment of $1.75 million from Wells Fargo directly for settling his objections. *In re Wells Fargo & Co. S'holder Derivative Litig.*, No. 16-cv-05541, 2021 U.S. Dist. LEXIS 48593 (N.D. Cal. Mar. 4, 2021).

27.     Moreover, under federal non-profit law, attorney fees cannot be used to support more than 50% of our program expenses. None of our attorneys' salaries are tied to fee awards in any case, and all of our attorneys have salaries that are a fraction of what they could make in private practice.

28.     HLLI frequently uses its attorneys and their family members as objectors in cases. No adverse inference should be drawn from this. HLLI attorneys are paid fixed salaries, do not receive any extra income for objecting, and do not object unless they volunteer to do so; we have no way of knowing if an HLLI attorney is a class member unless he or she volunteers the information. (In this case, my mother approached me when she received the class notice and asked us to review the settlement.) Often it is logistically easier to use an HLLI attorney or family member as an objector. We have found that settling parties sometimes use the threat of discovery to try to intimidate our outside clients; there is no risk of an HLLI attorney or family member being intimidated. In addition, on multiple occasions, settling parties have attempted to bribe our clients to fire us and withdraw meritorious objections or appeals. (After all, settling parties have millions of dollars at stake, and our clients only a few dollars at stake: an offered payment of tens of thousands of dollars can distort an objector's incentives and willingness to do the right thing.) We screen our clients very carefully for that possibility, and generally avoid that risk (which is much decreased with our success in *Pearson v. Target* establishing that class members may seek disgorgement of such unfair payments), but the risk becomes zero if we use an HLLI attorney or family member as the objector. There is also no reason not to use a single objector rather than several: it would be logistically much more time-consuming to compile objections and supporting declarations for five or six class members, as we could, but there would be no legal difference in the merits of the objection.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 12, 2022 in Houston, Texas.

                                                    Theodore H. Frank